Good morning, your honors. My name is John Hermina, and I'm here on behalf of the Egyptian defendants, what I will refer to as Egypt for ease. All right. Very good. Your honors, the late Mohammed Shaheen came to this country as a guest scholar. He was an employee, a civil servant of the Egyptian government. He was a professor at one of the public universities of Egypt, and he came here on a temporary visa. He was to return and to remain in Egypt for a period of two years pursuant to the J visa requirements. And that's all set forth, I believe, in excerpt page number 151. We're here this morning because the district court ruled that the waiver exception to the general rule that Egypt is exempt from jurisdiction in the court, the trial court, and the other determination, of course, was that Egypt was also subject to jurisdiction because of the commercial activity exception to the Foreign Sovereign Immunities Act. We believe that the court erred in making both determinations as to the waiver and as to commercial activity. Why don't you deal with the commercial exception first, if you don't mind. Not at all, your honor. I believe cases that came out of this court, like the Holden case, speak to the or look carefully at the issue of what constitutes a civil servant. In this instance, we do not have a person who is, who could be deemed anything but a civil servant. In addition, your honor, if the court were to determine that he was a civil servant, we have to look at what the activity of Egypt was in this case. And if your honor were to look at the complaint, the complaint alleges that the activity is, quote, procuring insurance, unquote, health insurance, to be sure. And the district court in his honor's finding was that it was provision of health insurance. Either way, the court, looking at the status of Mohamed Lachin, looking at the status of Egypt providing insurance in this case, I don't believe the court can determine that Egypt was acting as a private player in the marketplace. I note that his honor in the court below spoke about ERISA being filed every other Tuesday, I believe, in a transcript, he said. But I think that it's not every other Tuesday a case comes against a sovereign nation where the country is providing insurance to its own citizens pursuant to governmental provisions in Egypt, pursuant, it's fully funded by Egypt, fully designed by Egypt, for those people that come here temporarily to serve the purpose of their country. So I believe, your honor, that there is no commercial activity. What if the government in Egypt had given him a government travel card, credit card, and he'd run up airplane debts, whatever charges he'd run up, and then the government said, we're not going to pay it? I mean, isn't this situation like that? In other words, it's providing a benefit to a civil servant, but, nonetheless, it's kind of a customary and routine activity, and now it's declining to honor its obligations. It would not be deemed a commercial activity in the context of this case because, as the Court knows, as the Ninth Circuit has stated over and over again, we don't look at the activity outside of the framework of what's been alleged. And in the context of what's been alleged, your honor's example would be answered in the same manner as we have answered in our brief, and that is it would still be a governmental function. They're basically providing for the gentleman while he's here as a guest pursuant to the Egyptian government. In other words, the government could walk away from its obligation to pay the charges that were run up on its government credit card? The government would be obligated, as in the example of Loomis, to a third party. So this Court has previously held that Loomis and Egypt had a contract. And certainly, your honor, I think I want to reserve five minutes, but certainly in the example that your honor gave, that example presupposes the existence of a third party, and Egypt would be obligated to the third party bank as it was obligated to Loomis, particularly if there's a – and I don't want to go into the waiver, but certainly the three time honor situations that are articulated in Joseph E. Consulate of Nigeria, if there was arbitration provision, if there was a contract as to the governing law, or if there was a failure to allege sovereign immunities as an affirmative defense in the answer paper or in the context of a responsive plea. So yes, the answer would be S to the sheen, no, S to the bank, yes. I'm glad to answer any other questions the Court may have. I can speak to the waiver. I believe – Go ahead. Yes, your honor. I believe with respect to the waiver exception, there are four instances that are articulated in the case law, and those waivers are to be strictly followed because we're dealing with a foreign nation, we're dealing with a foreign policy. Judge Kessler in our district in D.C. always talks about that, and there are in the underlying case a lot of cases that we've mentioned. But – and may I also mention that the Indonesia case is a perfect example. It doesn't come out of the circuit, but we cited it in the underlying case before the district court judge. That case dealt with health insurance, and the Court said that that's not – that's – with the Court's analysis, that would not be commercial activity. Having said that, with respect to the immunity, we're talking about an express waiver where a country renounces its sovereign immunity or a – in a contract, the express leseia. So that's with respect to the congressional records that we cited in our brief. With respect to an implied waiver, we – it's quite specific. It has to be, again, an agreement to arbitrate by the country, a governing law, and as was the case with Loomis, and, thirdly, a failure to answer. So those weren't available, and there's a self-disclaiming document. In fact, we – I've always been – whenever the Court mentioned contract, I always thought about the Loomis contract because certainly, Your Honors, you're aware that the debt plan had a provision that says – we cited in our paper, it says this booklet is not a contract, and I believe that that's determinative of the issue. Thank you, Your Honor. I'll be glad to answer any other questions. Good morning. Randy Andrus, appearing for the Plaintiff Appellee, Mohamed Lachine, and his estate. We were here about two years ago on a joint issue where Loomis, another co-defendant, the third-party administrator in the ERISA plan, and Lachine asked for a joint decision. The district court had not reached the issue of whether or not there was a waiver of the Foreign Sovereign Immunities Act as to Lachine, but did grant a waiver as to the co-defendant Loomis. So this court sent us back to the district court for further proceedings on that specific issue of whether or not Egypt, who asserts the Foreign Sovereign Immunities Act, if an exception applies. And if an exception does apply, then that Foreign Sovereign Immunity defense is extinguished. I should note that it was just for that limited purpose because otherwise the Egypt defendants are in default, and it was just reopened for that limited purpose of whether or not an exception to the Foreign Sovereign Immunity Act applies. And, of course, our position is that multiple exceptions do apply. The standard that this Court set was that once a party offers evidence that the Foreign Sovereign Immunity applies, which we have, Lachine has, then the burden shifts to the proving to the party claiming immunity to prove by a preponderance of the evidence that the exception does not apply. So that sets up the standard of review and the standard that the district court had to follow of whether or not there was evidence. Now, the district court did that. They had the matter before it, and it asked the parties to submit what they wanted to submit and exercise and see if Egypt could meet their burden of proof and so forth. And the district court found that Egypt did not meet its burden of proof. It did not meet by a preponderance of evidence that there was the immunity applied. Specifically, it found that the waiver exception did apply. And it did not quite, wasn't forced to reach the issue of commercial activity. But if it did, then it found that that commercial activity exception also applied. And so in doing so, in its decision, and we asked that this Court affirm that decision because it properly found and it went through the proof that was before it, and given the opportunity for Egypt to submit proof, they did not meet that burden. And they went through the reasons why on the waiver exception, specifically why that exception applies here in Lachine, why that did. Whether implicitly or explicitly, the waiver exception applied for a multitude of reasons. And the whole body of law and evidence in the case showed that, in the record, that it was abundantly clear that there was at least an implicit, if not explicit, waiver of the Foreign Sovereign Immunities Act because the case law holds that if a foreign sovereign waives that and subjects itself to the law of a State, or in this case, the law of the Commonwealth of Pennsylvania in the business services, business service management agreement that it had with Loomis, the third-party administrator, or the actual plan, the ERISA plan. Now, Egypt made a conscious decision. When they exchanged... What's your closest case on the waiver issue? I mean, I don't think there's one that's squarely on point that I've seen on these facts. On the waiver issue, by implication, it's the Joseph case. What if we disagree with you on the waiver? What about the commercial activity? The commercial activity, there's a Supreme Court case on that one, and that's the case of the Weltman, the Republic of Argentina v. Weltover, Inc., 504 U.S. 607-614. Basically, that indicates that the commercial activity, and that's defined as either the regular course of commercial conduct or a particular commercial transaction or act. That's the definition under the statute. A State engages in commercial activity where it exercises only those powers that can be exercised by private citizens as distinct from particular sovereigns. The act need not be motivated by profit to be commercial under the Foreign Sovereign but instead must be the type of action which a private party engages in. What about the fact that he was a civil servant? You don't dispute that, do you? Well, we know he wasn't in the military. He was a visiting scholar to do studies. So, yes, we do dispute that he was a civil servant. It's undisputed, and there was no evidence really to controvert that. But that's determined by the law of Egypt, what his status is, correct? Yes, but that has to be proven also to the district court, and that wasn't done there. And there's no indication of what the law of Egypt is in that regard, except the fact he's a State employee who works at a State university. He is a – well, we're even disputing that. That was said, but that wasn't what was – and we would object to widening the scope of the evidence of what they can put in. In that regard, there was really no evidence, or if there was evidence, that was heard and considered by the district court. I think, if I read your brief correctly, you're contending that somehow the fact he was on a sabbatical leave took him outside the status of a civil servant? Right. He wasn't a soldier. He wasn't in the military. He was over here studying plants at UC Davis. I can only find that one of the weaker parts of your argument, because he was still here on university-related business to further his own education and become a better professor back in Egypt. But in any event, how do you answer your opponent's contentions about commercial activity? Because the burden should be not looked at whether or not he's a civil servant. That's – in some respects, that's irrelevant. The burden that they have shifts to them. It's their activity. And that's what the Welter case says. Foreign State activities are noncommercial if they are the kind that only a sovereign nation can perform. And then it goes on to say – Well, in much of the world, it's the sovereign nation that provides medical care. Do we have any information with regard to whether, from the perspective of the Egyptian government, this was something they were doing as a government? We don't have – they had the opportunity to produce their plan. The only plan that they produced, and that's what the district court relied on and had before them that they did not meet their burden on, that it's undisputed that the plan that was chosen was an ERISA plan. The language is there in the ERISA plan. And they submitted a declaration by Debbie Hayes, the administrator, with that plan. Their answer – Who paid for – who paid the premiums for the health insurance coverage? Well, Egypt, as I understand it, came to the United States, contacted the U.S. broker, and that U.S. broker, Rendezvous Corporation, then contacted a network of providers. And those network of providers also were administered by a third-party administrator. And presumably, at some point, those premiums or those amounts that were going to be paid into this ERISA plan that was designated by everyone as an ERISA plan would be paid by, presumably, or funded somehow, directly or indirectly, by Egypt. So the answer to the question is Egypt paid for it. My understanding is that – well, in this case, they didn't pay for it. And that's, you know, the man died because they didn't pay for it. They didn't honor their commitment that they had communicated to him that they would. They broke that. And so the focus is not on Mr. Lasheen and whether he's a civil servant. That's somewhat of a red herring. The focus is on the activity of Egypt. And in the Weltover, Supreme Court says that the activity is commercial under the Federal Foreign Sovereign Immunities Act, even if engaged in for the benefit of a foreign state citizen. So to answer the question, is he a civil servant or not, well, the Supreme Court says that's irrelevant. Well, that may answer and did answer the case with regard to Loomis. As far as the relationship between Egypt and Loomis, our court held that was a commercial transaction. But I'm not sure that speaks quite so directly to the relationship between Egypt and one of its own citizens. Well, Egypt communicated the terms of the plan and the preponderance of the evidence and the body of evidence shows that the plan that they communicated and that the transaction that they entered into was a commercial transaction for an ERISA plan. Well, let's take those apart. I mean, you keep coming back to ERISA plan, which sounds to me like the waiver argument. What is it that makes it a commercial transaction for a sovereign nation to provide or promise health care coverage to one of its citizens? They engaged in traffic. They engaged in trade. They engaged in commerce by seeking out a broker, a network of providers. Well, I think Judge Clifton's question was more narrow. Let's just say that they didn't do any of that. They just provided health insurance directly. You would concede, I think, that there would be no commercial activity in that scenario, correct? That's what Egypt is suggesting they did back in Egypt. No, I'm just saying hypothetically. Let's just say it's a direct benefit. Loomis isn't involved at all. They just said here is the government plan, period. If they're direct benefits, no sovereign immunity waiver, you'd say, under that circumstance, whether it's commercial or otherwise, right? Well, if they say here's the plan and they don't specifically say this is an ERISA plan and you have rights that are bestowed upon you in the U.S. courts with an ERISA plan, then perhaps so. But that's, well, that's the focus of the commercial argument. I understand your waiver argument, but right now I'm trying to concentrate on the commercial activities. And so it sounds like you're acknowledging that the provision of health services by Egypt to one of its own citizens may not necessarily be commercial. In some circumstances, it may be commercial. I understand you're making those arguments. But the core here is the provision or the promise that we'll pay for health services. And I'm not sure that that by itself makes it commercial. Well, here we don't have just that. We have not only that promise, but we have many others and many other activities in trade and commerce, commercial activities that went into that to do that. Well, to accomplish the task, in any country, presumably even if it was a government-owned service, they're going to have to employ and pay doctors, nurses, build facilities, engage in higher contractors to build hospitals and so forth. Does that make the provision of health services a commercial activity? Yes. If you engage in commercial transactions to provide health insurance and employ doctors at UC Davis, in this case. The United States military employs lots of contractors to feed, clothe and house soldiers. Does that mean the employment of soldiers by the United States government is a commercial activity? Perhaps abroad in those contexts, depending on how they're set up, I would say that they would then have waived their sovereign immunity. In many cases, the military sends doctors, hospitals. Let's bring it under U.S. law. Foreign troops come to the United States for training. I remember being surprised in a plane in Japan one time to discover that I was outnumbered by members of the Japanese, they didn't call it army, it's the self-defense whatever force, but they were there in force because they were training in Hawaii. Does that mean that the Japanese government has engaged in a commercial activity because it's put some of its soldiers for training in Hawaii and that the relationship between the Japanese government and its soldiers is a commercial relationship? I suppose one could argue, yes, that that's a commercial activity. You think that argument would be a very successful one? It depends on what the documents underlying the intent is. It seems like you're getting far reaches of the immunity doctrine. It seems to be your best argument, and that's kind of the question of the case, is that Egypt chose to enter the private market by participating in an ERISA plan and suffered the consequences of that rather than providing direct benefits. I don't think it's hard for me to see that if Egypt or any other country provided direct health benefits to its civil servants who came over here that that would constitute a commercial activity. On its face? I mean, if somebody comes over here, goes to the doctor, and the government pays for that, I don't see how that's a commercial activity. That's a benefit of governmental employment, isn't it? And the only question here, it seems to me, and I may be wrong in this, is does the extension, if you contract out with third parties for the provision of the same service and subject yourself to an ERISA plan in that context, does that remove the immunity that would otherwise exist? I gather you disagree with that. I think your approach would be a lot broader, but I'm not sure there's a case law that supports that. In the Saudi Arabia versus the Nelson case, another Supreme Court case seems to suggest that distinguishing between commercial and non-commercial acts when they become a player, as opposed to doing something that's merely a governmental act like revoking a license or extracting of natural resources, which only a government can do. And I think that the reason that the court is considering that is the reason that the court is not saying that they can't do it, but when they come over to the marketplace and participate in the marketplace, then they become subject to those activities, and those are not just some of those are ERISA plans that happen all the time in commercial transactions. And that's what the district court found, and that, based on all the evidence, that was their finding and that should not be disturbed or reversed at this stage. It found that Egypt did not meet its burden of proof in that regard, so we would ask that this court affirm that ruling. Is it your contention that when a representative of a foreign country acting on behalf of that country enters into any contract of any kind whatsoever, no longer has sovereign immunity in the event of a lawsuit arising from that contract? If the foreign country enters into any type of a contract, is that your question? Yes. I wouldn't say that that necessarily is carte blanche, any kind of a contract, and there's a waiver. But when it interposes and chooses law and chooses the forum and makes that conscious decision, which they did in this case to choose the federal courts and ERISA to apply and communicate that to the person and also the network providers. And they did that by entering into an ERISA contract, and the ERISA cases are lodged only in federal courts. Is that how that works? In the plan, and it's undisputed that that's the plan. And in their answer that was stricken, they also indicated that they were to the fiduciary in that plan. And in that plan document, it spells out multiple occasions what law would apply, what statute is being governed, how it's being set up. And not only in that, the plan document, but also in the benefit services management agreement that it had with a third-party administrator. It's undisputed in their correspondence and in that plan signed by Egypt that this is an ERISA plan governed under ERISA laws. And with those choice of forum clauses, with those choice of law clauses, they waive their sovereign immunity. So not only that exception, but also the commercial activities exception were found to exist by the district court based on the evidence. And that, in our request, should not be disturbed at this level. Thank you, counsel. Thank you. We'll hear about it. I think the initial question posed by the Court really goes to the crux of the matter. If there was a third party in the example Your Honor posed, the credit card company, Egypt would be liable to the credit card company because it administers the service. And, of course, other question relating to whether merely contracting people to facilitate ease with which you deal with your own citizens, whether it's the U.S., whether it's the Kuwaitis whom we represent also, or whether it's the Egyptians. They have to hire natives who administer things, but that does not make them engage in a commercial activity unless they do dumb things. And, frankly, once in a while they do. In the instance where Egypt is merely providing a service or health insurance coverage, or in Your Honor's example, to its national, who's here temporarily. And this is distinguished, of course. Their own cases distinguish the situation. You have the Sun versus Taiwan case. That activity impacted a, first of all, the activity was promoting tourism, which a travel agency could do. It's an activity that a player in the private market could engage in. And the victim of that conduct was a U.S. citizen of Taiwanese descent, clearly different from the situation. And the case they cite, the Argentina, I think they're talking about the 2000, the 1992 case that came out of this court, Siderman. In that case, Argentina advertised about a hotel, solicited guests through the U.S. agents that they had, Argentina's national airlines. Numerous Americans stayed at the hotel. The hotel accepted major credit cards and so on. Clearly different from what happened in this case. With respect to burden shifting, Egypt begins the process by saying I'm a sovereign nation, by asserting in its defense, the affirmative defense, that it is an immune entity. Then they have to come up with the evidence that is known as the burden of production. And the burden of production in the context that we have here requires more than simply saying something exists. They have to provide evidence within the case law. And my opposing counsel alluded to the Nigeria case. They have to provide evidence of one of three things to come up with a waiver or evidence that there was commercial activity. And that burden is not light in the case of a foreign nation. Assuming that Mr. Machine was not a civil servant, which is not the case here, the burden of Egypt is by a preponderance of the evidence. And I know we're in an appellate court here, but I'll use this example that I used in trials. If I take a hair out of my head and put it on a scale, I tip the scale that's preponderance of the evidence. Well, here we have a circumstance where the initial activity, contracting with Loomis, was determined to be a commercial activity. So why don't you think that extends to the beneficiary of the commercial activity? Well, because, Your Honor, this circuit is very careful to extend the benefit of a contract to a party that's not privy to that contract, and that's in the case of Pargo. Right. But the theory here is this, is that Egypt could have decided to provide health that it could have provided the health benefits directly or through some other mechanism, but here it chose to engage in a private to fund it as if it were a private company and engaged Loomis and became subject to an ERISA plan with all its formalities. Well, that's a great question, Your Honor. This business about ERISA, if you look at their S.E.R., page number eight, ERISA undertakes to draft all the documents. What we're talking about is Egypt choosing a third party to draft something and then to use words to throw the words ERISA around like salt and pepper. And if you look at E.R. 8, it says Loomis undertakes to prepare planned documents. It's part of the agreement that Egypt got nailed on in the case that we were here upon before, Your Honor. So to answer Your Honor's question as best as I can. Loomis is acting as Egypt's agent. If Egypt has hired Loomis, why isn't Egypt stuck with what Loomis has said? Well, because it's clear in the case of a foreign sovereign nation, we do not take the activity between the contractual relations between two parties and extend it for the benefit of a third party. That's clearly the Cargill case, Your Honor. I think I'm trying to raise a slightly different question, which is that you're trying to divorce yourself from the planned booklet because it's prepared by Loomis. But Loomis is doing that as the agent for Egypt and the other entities that have employed it. So why isn't Egypt responsible for saying in the planned booklet given to the individuals, in this case Lasheen, well, this is an ERISA plan, you've got rights to go to Federal court, and why isn't Egypt stuck with that? Well, you've got to have a contract. I understand the Court's concern, but you've got a contract. You have a contract between Egypt and that's different. That doesn't extend to them. The planned booklet at ER-151 says this is not – I'm sorry. I may be giving you the wrong – we have – Well, we know where to find the planned booklet. Yeah. This booklet is not a contract. Right. I think the question is that if you choose by third party and it's in a commercial transaction that subject – the third party subjects you to American law in a commercially manner, then why doesn't that apply to the beneficiary of the plan? Because the Foreign Sovereign Immunities Act is not a – the exceptions to it are not very generous. The conduct between – as in Your Honor's example, the conduct between Egypt hiring somebody and Egypt providing for a civil servant is completely different. I think the case law is very clear that we don't – Your Honor is correct. In other contexts, that may be the case. But we're talking about precisely the same concerns that Your Honor raised. We're – we simply don't – that doesn't carry over to a third party. Okay. I think we have Your Honor. Thank you, Your Honor. Yeah. Thank you very much. If I may be excused, Your Honor. The case is hereby submitted for decision.
judges: Carr, Thomas, Clifton